Judge SHEA dissents in a separate opinion.
Droney, Circuit Judge:
On Friday night, December 3, 2004, at approximately 8:45 p.m., in response to a 911 call, police officers from the Long Beach, New York, police department found the body of Bobby Calabrese.[3] Calabrese was lying face down next to his Infiniti automobile, which was still running. He had been shot in the back of his head at close range three times with a .44 caliber revolver. Calabrese had been a "runner" for an illegal sports betting organization.
The following Thursday, Nassau County police detectives interviewed Mark Orlando and Herva Jeannot, who were together the night of Calabrese's homicide. The detectives believed that Orlando and Jeannot had been with Calabrese that night. Orlando and Jeannot were questioned in separate rooms at the police station. Jeannot confessed to shooting Calabrese, stating that Orlando hired Jeannot to murder Calabrese to avoid paying a gambling debt to Calabrese. During his questioning, Orlando *116 gave two different statements to the police but denied being involved in the murder.
Orlando and Jeannot were charged with murder for their roles in Calabrese's death and, in August 2005, a jury in the New York Supreme Court for Nassau County convicted Mark Orlando of murder in the second degree. The trial court had severed Orlando and Jeannot's trials to avoid a Sixth Amendment Confrontation Clause violation that could have arisen from Orlando's jury hearing Jeannot's confession if Jeannot did not testify and thus could not be cross-examined about it.[4] Severing the trials, however, did not avoid violating Orlando's right to confront the witnesses against him, as the trial court allowed the jury to learn of Jeannot's confession implicating Orlando at Orlando's trial and Jeannot did not testify at Orlando's trial.
ORLANDO'S TRIAL
I. Evidence Before the Jury of Jeannot's Statement
The state's theory at trial was that Orlando paid Jeannot to murder Calabrese to extinguish a $17,000 gambling debt Orlando owed to Calabrese and that Orlando assisted Jeannot in the murder. The prosecution argued that Orlando lured Calabrese to the remote location near Long Beach[5] on the pretext of meeting to pay the $17,000 debt, but that Orlando had previously agreed to pay Jeannot to shoot Calabrese when Orlando met up with Calabrese. Orlando did not dispute at trial that he was present for the murder, but contended that he had intended merely to pay Calabrese; he did not expect Jeannot (who was a friend of Orlando's and a passenger in the car Orlando drove that night) to shoot Calabrese and then take the gambling money for himself.
During his police interrogation, Orlando gave two statements to Nassau County Police Detectives. Detectives McHugh and McGinn jointly interviewed Orlando when he gave his first statement, and Detective McHugh testified to this statement at Orlando's trial. According to McHugh, Orlando first stated that he and Jeannot were good friends and coworkers at Professional Credit Services, a Long Island debt collection agency. Orlando regularly gambled on sports. About one month before the murder, another coworker introduced Orlando to Calabrese. Orlando began to place bets through Calabrese and soon won $28,465.
Orlando's winning streak with Calabrese ended, and Orlando lost $17,800 over the course of two weeks. At that point, Orlando stopped betting with Calabrese. But Orlando still owed Calabrese $17,000, and he arranged to pay Calabrese on December 3.
In that first statement to the Nassau County detectives, Orlando indicated that he and Jeannot went together in Orlando's wife's car to pay Calabrese, did so, and otherwise had an uneventful evening. After Orlando paid Calabrese the $17,000, he and Jeannot made several stops: at a Suzuki car dealership to pick up a check, at an ATM, and at Orlando's friend's house to look at some new construction. Orlando *117 then dropped off Jeannot at Jeannot's home, around 10:30 p.m.
After Detective McHugh finished testifying, Detective McGinn took the stand and confirmed much of the substance of Orlando's first statement. According to McGinn, after Orlando signed a written statement summarizing that version of the night's events, Detectives McGinn and McHugh left the interview room. McHugh went to speak with Jeannot. Approximately three hours after leaving Orlando's interview room, McGinn returned to speak further with Orlando.
Before Detective McGinn had begun testifying at Orlando's trial (and out of the presence of the jury), counsel for Orlando had objected, on hearsay and Confrontation Clause grounds, to the admission of McGinn's anticipated testimony recounting Jeannot's statement as to Orlando's involvement in the murder. The trial court denied the objection, ruling that "this information that the People are intending to offer in their direct case is not being offered for the truth of the contents of the statement but rather to give a clear picture to the jury [of] what was going on during the interrogation of [Orlando]." T. 166-67.
After Orlando's objection was denied, the prosecution asked Detective McGinn about "the circumstances under which [McGinn] resumed speaking with" Orlando. T. 620.[6] McGinn testified that he had learned from Detective McHugh that Jeannot was making inculpatory statements about the murder. "I knew Detective McHugh was in talking to Mr. Herva Jeannot," McGinn testified. Id . "I believe," he told the jury, "that Herva Jeannot was relaying some of the events that really took place that night [of the murder]." Id .
McGinn then testified that he re-entered Orlando's interview room. Id . "I went back in and I told Mr. Orlando that Detective McHugh was over there talking to Herva [Jeannot] and he was probably giving us ... other facts that happened that night, the truth as to what happened that night." Id . "Now, would be the time ... to tell us what was going on." Id .
According to McGinn's testimony, Orlando responded, "[y]ou don't understand," and McGinn left the interview room. T. 620. McGinn testified that he returned a few minutes later. According to McGinn, "[a]gain, I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up ... what we felt were truer versions of the events of Bobby Calabrese's murder. That we had a videotape of the spot the meeting took place. That the meeting did not take place where [Orlando] originally told us it had taken place. I told [Orlando] that Herva Jeannot had given up where the gun was and that the defendant should ...[,] if he wants his version of the story told[,] ... tell us the truth at this point." T. 621.
Orlando initially responded, again, "you don't understand," but eventually stated, without elaboration, that he was afraid (of Jeannot) for his family. T. 621-23. McGinn testified that he again left the interview room and that he came back around an hour later. He then testified, over the renewed objection of Orlando's attorney, to the following: "I told [Orlando] ... that Herva Jeannot was, in fact, talking to the other detectives. [Jeannot] had given a statement and that he had implicated himself in the murder. [Jeannot] said that he was the murderer, but that Mark Orlando had paid him to do it." T. 623-24.
At this point, the trial court gave the jury a limiting instruction. The trial court stated, "Ladies and gentlemen, you have *118 been permitted to hear testimony about remarks made to the defendant by Detective McGinn about statements allegedly made by Herva Jeannot. You're to consider this testimony only when considering the circumstances under which the defendant himself may have made statements and for no other purposes." T. 624.
The trial court then instructed the jury "to completely disregard any statement allegedly made by Herva Jeannot when considering evidence against the defendant. ... You are not to concern yourself with whether Herva Jeannot did or did not make any statements to the police, if he did, what those statement[s] may have been or whether or not they were true."[7] Id .
McGinn then resumed testifying. He testified that, after learning of Jeannot's statement implicating Orlando in the murder, Orlando changed his account of the evening's events. Orlando stated that when he and Jeannot met Calabrese that night, Orlando paid Calabrese and then Jeannot unexpectedly shot Calabrese, taking the cash.[8] T. 676-82. According to Orlando, he and Jeannot then drove away, and Jeannot threatened to harm Orlando's (pregnant) wife if Orlando were to tell anyone about the homicide. T. 682. Jeannot told Orlando that Calabrese was not the first person Jeannot had killed and that Calabrese would not be the last. Id . As a result, according to Orlando, he then made the stops at the car dealership and elsewhere because he wanted people and cameras to observe that Jeannot was with him. In addition, at some point, Jeannot told Orlando to stop on a bridge, and Jeannot then threw the gun he used to kill Calabrese into the water.
II. The Prosecution's Summation
The prosecution argued in its summation to the jury that Orlando had paid Jeannot to murder Calabrese. The prosecution also specifically called to the jury's attention that "Detective McGinn leaves [Orlando's interrogation room], comes back a little later, ... [and] Detective McGinn finally says, look, [Jeannot's] giving it up. [Jeannot's] telling us everything. ... He's telling us he did the shooting and you paid him." T. 894-95.
Apart from Jeannot's statement, there was little evidence to support the state's theory. The prosecution showed that, after the murder, investigators found in Jeannot's home five one-hundred dollar bills and found in Orlando's home ten one-hundred dollar bills, all of which had a large-portrait image of Benjamin Franklin. The prosecution argued, "How do you know [Orlando] paid [Jeannot?] Why else would [Jeannot] do it, if not for $500, those five Ben Franklins hundred dollar bills ... a week after the execution murder. Just so happens the defendant has ten of his own [$100 bills] back in [his home]. Of course [Orlando] paid [Jeannot]. [Jeannot's] not doing it as a favor." T. 876.
The prosecution again returned to its "murder-for-hire" theory later in its closing argument, stating that "[Orlando]
*119 wasn't upset by watching Bobby die. That was what was supposed to happen. That is what he paid [Jeannot] to do, to do his dirty work for him. Couldn't do it himself." T. 885. The prosecution suggested that Orlando paid Jeannot when the pair briefly stopped at Orlando's house after the murder. T. 890.
III. Verdict and Sentence
The jury found Orlando guilty of murder in the second degree. Orlando was sentenced to an indeterminate term of 25 years to life in prison on August 18, 2005. He is currently serving his sentence. Jeannot was also convicted of the murder in a separate trial.
STATE COURT APPELLATE PROCEEDINGS
Orlando appealed his conviction to the New York Supreme Court, Appellate Division. People v. Orlando , 61 A.D.3d 1001, 878 N.Y.S.2d 185 (N.Y. App. Div. 2d Dep't 2009). Orlando contended that Detective McGinn's testimony as to Jeannot's statement was inadmissible hearsay and also violated Orlando's right to confront witnesses through cross examination, as guaranteed by the Sixth Amendment of the United States Constitution and incorporated against the states by the Fourteenth Amendment. Appellant's Br. at 70-77, People v. Orlando , No. 2005-08854 (N.Y. App. Div. 2d Dep't Mar. 23, 2008); Orlando , 61 A.D.3d at 1001-03, 878 N.Y.S.2d 185.
The Appellate Division rejected Orlando's argument in a single sentence, stating: "The [trial] court properly instructed the jury that the testimony was admitted for the limited purpose of explaining the detective's actions and their effect on the defendant, and not for the truth of the codefendant's statement." Id. (quoting People v. Ewell , 12 A.D.3d 616, 617, 786 N.Y.S.2d 545 (N.Y. App. Div. 2d Dep't 2004) ) (internal quotation marks omitted).[9] The Appellate Division also cited Tennessee v. Street , 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), for its conclusion that the trial court did not err in admitting Jeannot's statement through Detective McGinn. Id .
The New York Court of Appeals subsequently denied Orlando leave to appeal, thereby rendering the Appellate Division's decision final. People v. Orlando , 20 N.Y.3d 934, 957 N.Y.S.2d 694, 981 N.E.2d 291, 291 (2012).[10]
SECTION 2254 PROCEEDING IN THE DISTRICT COURT
Orlando, proceeding pro se , filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York. As in his direct appeal, Orlando argued that McGinn's testimony regarding Jeannot's statement was inadmissible hearsay and violated his Confrontation Clause right. The district court denied the writ.[11]
*120 The district court identified the following testimony by McGinn as at issue in the Confrontation Clause analysis:
I left the [interrogation] room at about 6:50 [AM]. I went back into the room at about ten minutes to eight. About 7:50 in the morning. And I told [Orlando] at this point that Herva Jeannot was, in fact, talking to the other detectives. He had given a statement and he had implicated himself in the murder. He said that he was the murderer, but that Mark Orlando had paid him to do it.
Orlando v. Nassau Cty. Dist. Atty's Office , 246 F.Supp.3d 569, 572-73 (E.D.N.Y. 2017).[12]
Relying principally on Tennessee v. Street , 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), and United States v. Logan , 419 F.3d 172 (2d Cir. 2005), the district court rejected Orlando's Confrontation Clause argument. Orlando , 246 F.Supp.3d at 571-76. The district court reasoned that Jeannot's statement was not offered against Orlando for its truth but only "provided context for explaining why Orlando altered his [original] exculpatory story" to admit that he had in fact been present for the murder but that Jeannot had unexpectedly committed it. Id. at 574. The district court also held that any error was harmless. Id. at 575-76.
The district court issued a certificate of appealability as to Orlando's Confrontation Clause argument. Id . at 578. Orlando then timely filed a notice of appeal.
DISCUSSION
Orlando argues that: (1) without his ability to cross-examine Jeannot, McGinn's testimony recounting Jeannot's statement violated Orlando's Confrontation Clause right; (2) the Appellate Division's ruling to the contrary was "objectively unreasonable;" and (3) the erroneous admission of the testimony was not harmless. We agree. Accordingly, we reverse the district court's denial of Orlando's petition.
I. Standard of Review and Section 2254 Framework
Under 28 U.S.C. § 2254, "a person in custody pursuant to the judgment of a State court" may petition a district court for a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Id. § 2254(a). We review de novo a district court's denial of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Lynch v. Dolce , 789 F.3d 303, 311-12 (2d Cir. 2015).
A petition for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d). "A state court decision is an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.' " Howard v. Walker , 406 F.3d 114, 122 (2d Cir. 2005) (quoting *121 Williams v. Taylor , 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ). However, that bar is not reached where "fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter , 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (internal quotation marks and citation omitted).
II. The Confrontation Clause Violation
The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. " 'The crux of this right is that the government cannot introduce at trial" an out-of-court witness's "statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination.' " United States v. Jass , 569 F.3d 47, 55 (2d Cir. 2009) (quoting Ryan v. Miller, 303 F.3d 231, 247 (2d Cir. 2002) ) (internal quotations omitted). To implicate the Confrontation Clause, the statement must be used to prove the truth of the matter asserted, and the statement must be "testimonial." Davis v. Washington , 547 U.S. 813, 821-22, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (citing Crawford v. Washington , 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ). In other words, it must be "testimonial hearsay." Id . at 823, 126 S.Ct. 2266.
Out-of-court statements may have a proper purpose other than being considered for their truth. The Supreme Court and this Circuit have acknowledged that a trial court's instruction to a jury to consider only for a limited, nonhearsay purpose the non-testifying witness's out-of-court statement "is generally sufficient to eliminate ... Confrontation Clause concern[s]." Jass , 569 F.3d at 55 (citing Richardson v. Marsh , 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ). That is because "[t]he law 'almost invariabl[y] assum[es]' that jurors follow such limiting instructions." Id . (quoting Richardson , 481 U.S. at 206, 107 S.Ct. 1702 ).
"Nevertheless, in Bruton v. United States , ... the Supreme Court identified an exception to th[e] assumption" that jurors follow limiting instructions. Id . In Bruton v. United States , 391 U.S. 123, 124, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the defendant Bruton and his codefendant were tried jointly for armed postal robbery. A postal inspector testified that the codefendant confessed to him that Bruton and the codefendant committed the robbery together. Id. The codefendant did not take the stand, so he could not be cross-examined. Id. at 128, 88 S.Ct. 1620. The district court provided a limiting instruction to the jury that "although [the codefendant's] confession was competent evidence against [the codefendant] it was inadmissible hearsay against [Bruton] and therefore had to be disregarded in determining [Bruton's] guilt or innocence." Id. at 125, 88 S.Ct. 1620.
The Supreme Court reversed Bruton's conviction, holding that because his codefendant was not subject to cross examination and "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt," admission of the codefendant's confession in front of Bruton's jury violated Bruton's "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." Id. at 126, 88 S.Ct. 1620.
The Court further explained that "[n]ot only are [alleged accomplices'] incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh *122 their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice ... does not testify and cannot be tested by cross-examination." Id. at 136, 88 S.Ct. 1620.
As a result, when a non-testifying witness's confession "expressly" implicates the defendant, "the risk that the jury will not, or cannot, follow instructions [to limit its consideration of the evidence for a proper purpose] is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Richardson , 481 U.S. at 207-08, 107 S.Ct. 1702 (quoting Bruton , 391 U.S. at 135-36, 88 S.Ct. 1620 ). When a jury hears such express incriminations, even if given a "clear" limiting instruction, "the effect is the same as if there had been no instruction at all." Bruton , 391 U.S. at 137, 88 S.Ct. 1620.
Although the non-testifying witness in Bruton was a codefendant in a joint trial, Bruton applies equally to the testimonial and incriminating statements of non-testifying accomplices tried separately. See Crawford , 541 U.S. at 57, 69, 124 S.Ct. 1354 (stating that testimonial statements admitted without the opportunity to cross-examine the declarant violate the Confrontation Clause and referring to Bruton as barring "accomplice confessions where the defendant had no opportunity to cross-examine"); Tennessee v Street , 471 U.S. 409, 411, 414-15, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (recognizing that if the jury had been asked to infer that the confession of the non-testifying accomplice-who was tried separately-proved that the defendant participated in the murder, "Confrontation Clause concerns would have been implicated").
Here, the Appellate Division correctly acknowledged that, absent cross-examination of Jeannot, admission of his facially incriminating statement risked violating the Confrontation Clause, as was recognized in Bruton .[13] People v. Orlando , 61 A.D.3d at 1002, 878 N.Y.S.2d 185. However, the Appellate Division reasoned that the jury would use this evidence only to "explain the detective's actions and their effect" on Orlando-that effect presumably being the reason why Orlando changed his account of the events of the night of the murder. Id .
That conclusion by the Appellate Division was an unreasonable application of Bruton . McGinn led the jury to believe that Jeannot had actually made the statement McGinn recounted, and that statement expressly inculpated Orlando as Jeannot's accomplice in the murder. Bruton plainly instructs that the jury could not be presumed to disregard Jeannot's statement for its truth, even with a limiting instruction.[14]
*123 A. Jeannot Was an Out-of-Court Witness
The state argues in its brief that "[n]either McGinn nor McHugh ever testified that Jeannot actually made the statements at issue," Respondent's Br. at 29-30; in other words, that Jeannot was not an out-of-court "witness" within the meaning of the Confrontation Clause, see Davis , 547 U.S. at 821-22, 126 S.Ct. 2266. And so, the state contends, the situation here was no different than a jury merely hearing that an investigator had used deception to elicit a confession.
The state is incorrect; of course the prosecution led the jury to believe that Jeannot had actually made the statement McGinn recounted. McGinn testified that, "I knew Detective McHugh was in talking to Mr. Herva Jeannot," and that, "I believe that Herva Jeannot was relaying some of the events that really took place that night." T. 620. The prosecution never disavowed that Jeannot had made the statement, and it even recounted the statement in its summation. And that very statement was the reason for the Bruton severance in the first place. Thus, Jeannot was indeed an out-of-court "witness" subject to the cross-examination requirements of the Confrontation Clause.[15]
B. The Admission of Jeannot's Statement Was Clearly Barred by Bruton
With the jury having heard this expressly incriminating statement from Jeannot, the only reasonable conclusion was that the Confrontation Clause was violated under Bruton . The risk that the jury would consider Jeannot's statement for its truth was simply too great to allow the jury to hear it, absent cross-examination of Jeannot. Indeed, "the overwhelming probability" of jurors' inability to "thrust out of mind" express "testimony that 'the defendant helped me commit the crime' ... is the foundation of Bruton ." Richardson , 481 U.S. at 208, 107 S.Ct. 1702 (emphasis added); see also Bruton , 391 U.S. at 129, 88 S.Ct. 1620 ("The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds.") (internal quotation marks and citation omitted) (overruling Delli Paoli v. United States , 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), and adopting the reasoning of the dissent in that decision).
The Confrontation Clause violation here is even clearer than in Bruton . Detective McGinn did not merely recount Jeannot's confession implicating Orlando; he also vouched for its veracity. McGinn testified, "I believe that Herva Jeannot was relaying some of the events that really took place that night ... the truth as to what happened that night," T. 620 (emphasis added), and "I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up ... what we felt were truer versions of the *124 events of Bobby Calabrese's murder."[16] T. 621 (emphasis added). That testimony by McGinn made it even less likely than in Bruton that the jury would have obeyed the trial court's limiting instruction. See, e.g. , United States v. Forrester , 60 F.3d 52, 63-64 (2d Cir. 1995) (discussing the prejudicial impact of government agents vouching for witnesses).
Likewise, the prosecution's summation further undermined any possible effectiveness of the limiting instruction when it reminded the jury of its murder-for-hire theory three times and specifically called to its attention McGinn's testimony that he told Orlando, "[Jeannot's] telling us everything .... He's telling us he did the shooting and you paid him." T. 895. But, as discussed below with regard to the harmless error analysis, the evidence-other than Jeannot's statement-that Orlando had hired Jeannot to murder Calabrese, was weak. Thus, the likelihood that the jury credited Jeannot's statement was higher even than in Bruton , where the Supreme Court did not suggest that the prosecution had undermined the limiting instruction.[17]
In opposing Orlando's petition, the state relies primarily on the Supreme Court's decision in Tennessee v. Street , 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). In Street , the defendant, Street, was tried for murder separately from his alleged accomplice, Peele. Id. at 411, 105 S.Ct. 2078. Street had confessed during an interview with police to participating in a burglary and the murder with Peele. Id .
In its case-in-chief, the state introduced Street's confession. Id. Street then took the stand during his defense case, and he testified that the police had coerced his confession and that he had not been involved in the murder. Id. Street claimed that the police had shown him Peele's confession during his interview and forced Street to give the same account as Peele. Id.
The trial court then permitted the state to introduce in its rebuttal case Peele's confession through the testimony of Sheriff Papantoniou, the police officer who had taken it. Id. at 411-12, 105 S.Ct. 2078. The state showed the obvious differences between the two statements to discredit Street's testimony that his confession had been coerced and that the statements' claimed similarities demonstrated the coercion. Id. at 412, 105 S.Ct. 2078. Both at the time the police officer recounted Peele's statement and in its jury instructions, the trial court instructed the jury that Peele's statement was admitted not for its truth, but rather only to rebut Street's contention that his confession was coerced. Id. Peele did not testify at Street's trial and, thus, could not be cross-examined about his statement.
The Supreme Court affirmed Street's murder conviction. Id. at 417, 105 S.Ct. 2078. According to the Court, "[t]he nonhearsay *125 aspect of Peele's confession-not to prove what happened at the murder scene but to prove what happened when respondent confessed-raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination ... was [thus] satisfied by Sheriff Papantoniou's presence on the stand." Id . at 414, 105 S.Ct. 2078. After all, the Supreme Court stated, "[i]f [Street's] counsel doubted that [the accomplice's] confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination [Street's] counsel could also challenge Sheriff Papantoniou's testimony that he did not read from Peele's statement and direct respondent to say the same thing. In short, the State's rebuttal witness against [Street] was not Peele, but Sheriff Papantoniou." Id.
The Court in Street went on to acknowledge that its conclusion depended on the "crucial assumption" that the jurors followed the trial court's limiting instructions. Id . at 415, 105 S.Ct. 2078. There, as in Bruton , Street's accomplice had expressly implicated him in the crime. But unlike in Bruton , Street had placed the state in the position of not being able to effectively challenge Street's testimony that his confession was coerced. And "the State's most important piece of substantive evidence was [Street's] confession." Id . The only available way to rebut Street's contention of a coerced confession was to compare Peele's confession with Street's; if they were different, that would tend to show that Street's coercion testimony was not credible. See id . at 415-16, 105 S.Ct. 2078. And so, if the trial court in Street had not allowed the accomplice's confession to be brought before the jury, that "would have been at odds with the Confrontation Clause's very mission-to advance the accuracy of the truth-determining process." Id . at 415, 105 S.Ct. 2078.
Thus, the Court in Street found, unlike in Bruton , that there were "no alternatives [but allowing admission of the accomplice's confession] that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." Id .
Notably, in its conclusion, the Court in Street also took care to emphasize that the "prosecutor's questions and closing argument" had done nothing to distract the jury from the accomplice confession's "distinctive and limited purpose." Id . at 417, 105 S.Ct. 2078. It was only "in this context " that the trial judge's instructions were sufficient to prevent a Confrontation Clause violation. Id . (emphasis added).
This case is very different from Street . The prosecution argued that Jeannot's statement merely showed "context" for why Orlando changed his statement. But Jeannot's statement went far beyond any limited value in showing why Orlando changed his account of what happened that night. The prosecution elicited testimony from Detective McGinn that Jeannot had actually made the incriminating statement, and McGinn vouched for Jeannot's account. In its summation, the prosecution also repeated Jeannot's statement, and pressed its murder-for-hire theory.
Moreover, the prosecution's need for the purported "context" was of little importance as compared to the need in Street . Orlando's changing his account of the homicide was no different than many investigations when suspects make a series of statements; absent the substance of Jeannot's statement, the jury still could have learned that after several hours of interrogation, Orlando revised his story and placed himself at the scene of the murder and admitted to lying about his original account. That approach would have significantly advanced the prosecution's case without a critical narrative gap *126 and, accordingly, the "truth-seeking function" of the trial would not have been impeded in a way comparable to Street . See id . at 415-16, 105 S.Ct. 2078. Nor did Orlando take the stand at his trial, and so the credibility of his own trial testimony was not an issue, unlike in Street where the state otherwise would not have been able to challenge Street's principal defense of coercion in giving his statement.
To extend Street to the situation presented here would eviscerate the core protection of Bruton . To allow admission of Jeannot's statement through McGinn would permit the admission of inculpatory statements of non-testifying codefendants whenever the defendant changed his initial statement to investigators after investigators told the defendant of an accomplice's incriminating confession. The prosecution would need only then argue to the trial court that the other confession was being shown to the jury just to show why there were changes to the original statement.[18] ,[19]
* * *
We hold that the Appellate Division unreasonably applied Bruton in concluding that Orlando's Sixth Amendment right to cross-examine a witness against him was not violated when the jury heard of Jeannot's statement implicating Orlando in the murder. To the extent that the Appellate Division applied Street , it also extended that decision unreasonably.[20]
III. The Error Was Not Harmless
As Orlando and the state agree, the improper admission of evidence in violation of the Confrontation Clause is subject to review for harmless error. Hendrix v. Smith , 639 F.2d 113, 115 (2d Cir. 1981) (citing Chapman v. California , 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ; Schneble v. Florida , 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) ).
*127 When a state court makes a harmless error determination on direct appeal, we owe the "harmlessness determination itself" deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Ayala , 135 S.Ct. at 2199. Here, because the Appellate Division did not determine that the admission of McGinn's testimony as to Jeannot's statements was harmless, we owe no deference to the Appellate Division on that issue. E.g., Cotto v. Herbert , 331 F.3d 217, 253 (2d Cir. 2003) ("In this case, harmless error was never reached in the state courts, and there is therefore no state ruling which commands AEDPA deference.").
An error was harmless unless it resulted in "actual prejudice," Davis v. Ayala , --- U.S. ----, 135 S.Ct. 2187, 2197, 192 L.Ed.2d 323 (2015) (quoting Brecht v. Abrahamson , 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ), meaning that a court has "grave doubt about whether" the error "had 'substantial and injurious effect or influence in determining the jury's verdict.' " Id. at 2198 (quoting O'Neal v. McAninch , 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) ). This " Brecht standard" requires "more than a 'reasonable possibility' that the error was harmful." Id . (quoting Brecht , 507 U.S. at 637, 113 S.Ct. 1710 ).
We have little doubt that the improperly admitted testimony as to Jeannot's statement had such a powerful effect on the jury. The prosecution's theory was that Orlando was guilty of murder for acting as Jeannot's accomplice by paying Jeannot to shoot Calabrese and helping Jeannot to do so. The trial judge instructed the jury that, to convict Orlando, the prosecution had to prove that Orlando acted in concert with Jeannot. The state argues that, even absent admission of Jeannot's confession through McGinn's testimony, the evidence of Orlando's guilt was "nothing short of overwhelming." Respondent's Br. at 47.
In support, the state contends that Orlando's $17,000 gambling debt to Calabrese was compelling evidence of motive; that the hundred-dollar bills found in the homes of both Orlando and Jeannot after the murder were evidence of the murder-for-hire transaction; and that forensic testimony as to the location of bullet holes in Calabrese's sweatshirt showed that Orlando pulled the sweatshirt over Calabrese's head before Jeannot shot him. Finally, the state emphasizes that the video evidence, as well as cell site evidence, showed that Orlando was at the location where the homicide occurred. We address these arguments in turn.
A. Evidence of Motive
Although it was undisputed that Orlando owed Calabrese $17,000, the evidence showed that Orlando had won $27,000 in the month prior. Accordingly, he had net winnings of $10,000 over a six-week period. Moreover, the evidence showed that Orlando had $2,700 in cash in his residence after the murder (and after he purportedly paid Jeannot to commit the murder). And so, the evidence that Orlando lacked the funds to pay Calabrese was slight.[21]
Moreover, it strains credulity that Orlando would have believed that murdering a courier in an illegal gambling operation would erase a gambling debt of $17,000 and prevent attempts by the other members of the gambling operation to seek payment. The prosecution argued that Orlando's plan was to murder Calabrese and then claim to Calabrese's superiors in the illegal sports betting organization that he had paid Calabrese (and that Calabrese *128 must have been robbed and murdered by someone else). But it certainly is not obvious that Orlando would have thought such a plan would work.
B. Evidence of a Murder-for-Hire Transaction
Similarly, the discovery of a small number of one-hundred-dollar bills in the homes of both Orlando and Jeannot after the murder was not particularly probative of a murder-for-hire transaction. The state asserts that the hundred-dollar bill design with "the large picture of Ben Franklin" was "then new" and, thus so rare as to mean Jeannot's bills likely came from Orlando. Respondent's Br. at 48. But that design began circulating in 1996,[22] eight years before the murder of Calabrese. A jury thus would not have found it remarkable that the bills in both homes had the same design. Nor did the U.S. currency found in Jeannot's home have any fingerprints, sequential serial numbers, or DNA that might have linked them to a transaction between Orlando and Jeannot.
In addition, only $500 in bills was found in Jeannot's home. It is entirely unclear why Jeannot would accept only $500 to commit a murder, particularly given that Jeannot undisputedly knew Orlando owed Calabrese many times that amount. The prosecution suggested that the $500 found in Jeannot's home may have been only a small portion of the murder-for-hire payment. But the prosecution presented no theory or evidence as to what may have happened to any cash payment that exceeded the $500 found.
C. Forensic Evidence
We turn next to the expert testimony of two other Nassau County detectives and Nassau County Deputy Chief Medical Examiner DeMartino regarding the bullet holes in Calabrese's sweatshirt. The state argues that forensic evidence clearly established that, just before Jeannot fired the first shot, Orlando pulled Calabrese's sweatshirt over Calabrese's head to help Jeannot shoot him.[23]
We disagree that this evidence was persuasive of Orlando helping Jeannot shoot Calabrese. First, the location of the bullet holes did not clearly establish that Calabrese's sweatshirt had been pulled up over his head at the time the first shot was fired. That is the relevant time that, according to the prosecution, Orlando would have been pulling up the sweatshirt. The first shot undisputedly went through Calabrese's right forearm, making holes only in his sweatshirt sleeve, and the bullet then lodged in the right side of Calabrese's head. The prosecution suggested to the jury that Orlando had pulled the sweatshirt so far over Calabrese's head that the back of his head was exposed, allowing the first bullet to pass through the sleeve without creating any other holes in the sweatshirt. That is possible, but that evidence is just as-if not more-consistent with Calabrese, for example, putting up his arms in a defensive position, and the first bullet passing through his right sleeve and arm, and then, into his uncovered[24] head. Indeed, *129 the medical examiner DeMartino concluded that the wound in Calabrese's right arm was consistent with Calabrese having raised his arm in a defensive manner prior to the first shot being fired. Or, even if the sweatshirt had been pulled up, it could have been done by Jeannot prior to shooting Calabrese.
By contrast, the forensic evidence was clearer that at the time the second and third shots were fired into the back of Calabrese's head, his sweatshirt was pulled up over his head. There were holes in the back of Calabrese's sweatshirt that matched up with the bullet wounds in the back of his head. But, it is not disputed that at the time the second and third shots were fired, Calabrese was already lying, face-down, on the ground from the effect of the first shot. Maybe Orlando pulled the sweatshirt over Calabrese's head after the first shot; maybe it was Jeannot who pulled up the sweatshirt at this point to avoid blood splatter; or maybe the sweatshirt came upward as Calabrese fell to the ground and struggled after the first shot. In any event, the only obvious conclusions from the sweatshirt and autopsy evidence were that Calabrese was first shot by Jeannot from behind, while he was standing up, and then twice more while lying on the ground, with the sweatshirt over his head for the second and third shots. But it is far from clear how the sweatshirt ended up over his head.
The state introduced no other forensic evidence pointing to Orlando, such as DNA, fingerprints, or blood in his car or on his clothing. In sum, the forensic evidence to support the prosecution's accomplice theory was insubstantial.
D. Orlando's Choice of a Meeting Location
The evidence that Orlando chose a discreet meeting location to pay his debt to Calabrese was also only minimally probative of his guilt. Orlando told investigators that he and Calabrese had arranged to meet on December 3 in Island Park, and that he called Calabrese shortly beforehand to change the meeting to a more secluded place because there were several people within sight of the planned meeting location.
Jurors could have credited Orlando's choice of meeting location as part of a plan to murder Calabrese, but they could also reasonably have accepted that Orlando was concerned about being seen engaging in an illegal $17,000 gambling transaction.
E. Evidence of an Attempt to Create an Alibi
The prosecution also contended that the jury could have construed Orlando's several stops after the murder as evidence of an attempt to manufacture a false alibi. Orlando explained the stops as an attempt to be seen with Jeannot, so that Jeannot could not blame the murder on Orlando. But, a jury could instead have reasonably inferred that, given Jeannot's purported threat to Orlando to maintain his silence, Orlando's behavior after the murder was consistent with an attempt to put Jeannot at ease that Orlando would not report Jeannot's role in the murder.
F. Evidence Orlando Was at the Murder Scene
Lastly, we acknowledge that the prosecution needed only to convict Orlando of murder and not to prove specifically its *130 murder-for-hire theory. In that regard, the state emphasizes, for example, the evidence that Orlando was present at the murder scene. In addition, Orlando's coworker Barbara Diamant testified that Orlando told her the morning after the homicide that Calabrese had been shot in the back of the head three times, before this became public information. However, that Orlando was present for the murder was not disputed by him in his second statement or at trial, and as discussed above, the evidence that Orlando assisted the murder in some way was made substantially stronger by Jeannot's incriminating confession.
* * *
In sum, considered both in isolation and cumulatively, the properly admitted evidence of Orlando's guilt leaves us with "grave doubt" about whether the trial court's error substantially and injuriously influenced the jury's verdict. See Davis , 135 S.Ct. at 2198. McGinn's testimony of Jeannot's incriminating statement was essential in persuading the jury of Orlando's guilt and meets the bar set by the Brecht standard. Accordingly, the constitutional error in this case was not harmless.
CONCLUSION
For the foregoing reasons, we REVERSE the district court's denial of Orlando's petition, and REMAND the case to the district court with instructions to issue a writ of habeas corpus to Orlando on the sixtieth calendar day after the issuance of our mandate unless the District Attorney of Nassau County has, by that time, taken concrete and substantial steps to expeditiously retry Orlando. The mandate shall issue forthwith.

Long Beach is in Nassau County, New York, on Long Island.

Although the record on appeal does not reflect the trial court's decision to sever the trials, both Orlando and the state describe the trial court as having (appropriately) severed Orlando and Jeannot's trials "pursuant to" Bruton v. United States , 391 U.S. 123, 124, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Pet. Br. at 2; Respondent's Br. at 39.

Although officers from the Long Beach police department responded to the report of the homicide, the homicide occurred in Island Park, which is a town adjacent to Long Beach.

Citations to the trial transcript are abbreviated "T. __" throughout this opinion.

During its final charge to the jury, the trial court gave substantially the same limiting instruction as to McGinn's testimony regarding Jeannot's statement as it had given earlier in the trial.

Orlando first relayed this second version of events to McGinn. Then, McGinn left the room, and Nassau Country Detective Cerighino, who had not been present for the questioning of Orlando, came into the room. Cerighino reduced Orlando's second account to writing. Cerighino wrote the statement based upon what Orlando told him, and Orlando signed it. The written statement is substantially similar to McGinn's account at trial of the second version of events that Orlando gave to McGinn.

Although the Appellate Division described Jeannot as a "codefendant," as is mentioned in the above text, he was tried and convicted at a separate trial after the Bruton ruling severing the trials.

Following his unsuccessful state appeals, Orlando filed two unsuccessful coram nobis petitions in state court alleging ineffective assistance of appellate counsel. See People v. Orlando , 85 A.D.3d 823, 925 N.Y.S.2d 334 (N.Y. App. Div. 2d Dep't 2011) ; People v. Orlando , 98 A.D.3d 691, 950 N.Y.S.2d 280 (N.Y. App. Div. 2d Dep't 2012). There is no dispute that Orlando has properly exhausted his Confrontation Clause claim for federal habeas review.

Orlando pursues only his Confrontation Clause challenge on appeal. See generally Pet. Br.

The district court did not recount or discuss the portion of McGinn's testimony to the jury that vouched for the truth of Jeannot's statement. T. 620 ("Herva Jeannot was relaying some of the events that really took place that night ... the truth as to what happened that night."); T. 621 ("I explained to Mr. Orlando that Herva Jeannot was, in fact, giving up what we felt were truer versions of the events of Bobby Calabrese's murder.") (emphasis added). That aspect of McGinn's testimony is discussed later in this opinion.

Although the Appellate Division did not cite Bruton or articulate its holding, a state reviewing court need not to do so in order for it to be considered to have applied the constitutional principles set forth in Supreme Court precedent. See, e.g. , Mitchell v. Esparza , 540 U.S. 12, 16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) ("[A] state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (internal quotation marks and citation omitted). The Appellate Division did cite Tennessee v. Street , 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), which is discussed later in this opinion.

In addition, there is no doubt that Jeannot's statement was "testimonial." See Davis, 547 U.S. at 821-22, 126 S.Ct. 2266 (holding that statements made "in the course of police interrogation" are testimonial when made under "circumstances objectively indicat[ing] ... that the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution").

A witness need only recount the critical substance of the out-of-court statement to implicate the Confrontation Clause. See Ryan v. Miller , 303 F.3d 231, 248-49 (2d Cir. 2002) (granting section 2254 petition due to non-harmless Confrontation Clause violation, stating that "[i]f the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible," and collecting cases); Ocampo v. Vail , 649 F.3d 1098, 1108-11 (9th Cir. 2011) ("Supreme Court law ... clearly establishe[s] that testimony from which one could determine the critical content of the out-of-court statement [is] sufficient to trigger Confrontation Clause concerns.").

We acknowledge that the latter statement could possibly be read as McGinn explaining only to Orlando rather than to the jury that McGinn and McHugh believed Jeannot was telling the truth about Orlando's involvement the murder. However, there was no such ambiguity with regard to McGinn's first statement that he believed Jeannot was relaying what "really took place that night." T. 620.

We note also that the limiting instruction was decidedly unclear. The trial court instructed the jury to consider the testimony at issue when considering "the circumstances under which Orlando made any statements." T. 624. McGinn, however, had just told the jury that the "circumstances" which led him to resume interrogating Orlando were that "Herva Jeannot was relaying some of the events that really took place that night." T. 620. By contrast, even in Bruton , the jury instructions were "concededly clear." Bruton , 391 U.S. at 137, 88 S.Ct. 1620.

The state also contends that the admission of Jeannot's statements established "the voluntariness of [Orlando's] statements." Respondent's Br. 30-31, 35. But, unlike Street, Orlando did not contest their voluntariness at trial. And, there was other evidence that Orlando's statements were voluntary. The detectives testified that Orlando was advised of his Miranda rights and agreed to speak with them, and Orlando indicated that he understood his Miranda rights, was willing to give a statement without speaking with a lawyer or having one present, and that he was "mak[ing] the ... statement[s] freely and voluntarily." T. 546.

Other circuits have also recognized that Street does not permit the admission of an out-of-court accomplice statement merely because it may have some purpose other than for its truth. See, e.g., Thomas v. Hubbard , 273 F.3d 1164, 1172-73 (9th Cir. 2001) (granting section 2254 petition due to Confrontation Clause violation and other constitutional errors, and stating that "[e]ven if the statements [we]re classified as non-hearsay, they are sufficiently prejudicial that the jury would be unable to consider them only for limited purposes and would consider them for their truth in violation of the Confrontation Clause") (abrogated on unrelated grounds by Payton v. Woodford , 299 F.3d 815, 828-29 n.11 (9th Cir. 2002), which the Supreme Court then vacated, 538 U.S. 975, 123 S.Ct. 1785, 155 L.Ed.2d 662 (2003) ); cf. United States v. Taylor , 569 F.3d 742, 750 (7th Cir. 2009) (finding no Confrontation Clause violation because the out-of-court statements were nonhearsay and there were no "complicating circumstances, such as a prosecutor who exploits nonhearsay statements for their truth ") (internal quotation marks and citation omitted) (emphasis added).

The state's reliance on United States v. Logan , 419 F.3d 172 (2d Cir. 2005), is also misplaced. In Logan , the coconspirators' statements concerning an alibi were admitted only to show the existence of a conspiracy. Id . at 176-78. Moreover, the statements were not admitted for their truth but-to the contrary-were shown to be untruthful. Id . Here, Jeannot's statement-as recounted by Detective McGinn-was consistent with the state's theory and was specifically utilized by the state to support that theory.

The state also did not introduce evidence of Orlando's bank records at trial.

See, e.g., Carl Rochelle, Redesigned $100 Bill Aimed at Foiling Counterfeiters , CNN (Mar. 25, 1996, 1:35 AM), http://edition.cnn.com/US/9603/new_100_bill/index.html (stating that the redesigned $100 bills with a larger Ben Franklin were to go into circulation on March 25, 1996).

The district court agreed with that argument, stating that the forensic evidence gave rise to "an inescapable inference ... that Orlando ... pulled the sweatshirt over Calabrese's head." Orlando , 246 F.Supp.3d at 576.

Nassau County Forensic Evidence Bureau Detective Kovar, whom the prosecution called to testify as to trace forensic evidence at the scene of the crime, agreed that the hood of the sweatshirt was not covering Calabrese's head at the time the first shot was fired.